# MARYLAND ELECTRIC RAILWAYS COMPANY

*vs.*

## CHARLES LAPP.

*Street Railroad—Injury to Person on Track—Lighting of Car.*

That an electric car, running on a track near the station of a steam railroad company, under a trackage arrangement with the company, did not have a headlight burning at the time that an employee of such railroad company was run down by it while crossing the track, at 6.30 in the morning, did not show negligence, the car being so lighted as to be perfectly visible, it moving at the time on a straight track, and it not passing over any public crossing.                    p. 171

The court can take judicial notice of the fact that a lighted electric car can be seen before daylight.                    p. 171

*Decided January 9th, 1923.*

Appeal from the Court of Common Pleas of Baltimore City (DUFFY, J.).

Action by Charles Lapp against the Maryland Electric Railways Company. From a judgment for plaintiff, defendant appeals. Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, and ADKINS, JJ.

*George Weems Williams* and *Carlyle Barton,* with whom was *George S. Yost* on the brief, for the appellant.

*James O. Scrimger,* with whom was *Daniel S. Sullivan* on the brief, for the appellee.

Boyd, C. J., delivered the opinion of the Court.

The appellee recovered a verdict against the appellant for injuries sustained by the alleged negligence of the appellant in running one of its cars out of Camden Station in Baltimore on a track which it at that time used for its cars in and out of that station for what is known as its Short Line. This is an appeal from a judgment rendered on that verdict. The appellee was in the employ of the Baltimore and Ohio Railroad Company as a distributor in the oil house of the latter company in the yards below that station. He was on night duty and before leaving was required to go to an office of the railroad company to report. It was about 6.30 o'clock in the morning. He walked from the oil house along the side of the track, on what he spoke of as a "wagon drive," for about two squares, and started to cross over the track used by the appellant, to go to the office where he reported. He was struck by a car of the defendant and was badly injured. It was a car which was due to leave Camden Station for Annapolis at 6.30 A. M. and it struck the appellee about twenty feet below the shed of Camden Station.

The plaintiff offered one prayer, which was on the measure of damages and was granted, and the defendant offered nine, the second, seventh, eighth, and ninth of which were granted, and the others were rejected. The only bill of exceptions in the record contains the rulings of the lower court in granting the plaintiff's prayer and rejecting the first, third, fourth, fifth, and sixth of the defendant. The appellant relies chiefly on the alleged error in rejecting the first prayer, which asked the court to instruct the jury "that under the pleadings in this case there has been offered no evidence legally sufficient to entitle the plaintiff to recover and that their verdict must therefore be for the defendant." It claims that by that prayer it raised the question of the sufficiency of the evidence as to its negligence, and also that of contributory negligence upon the part of the appellee. It is contended on the part of the appellee that the ruling on that prayer does not present the question of contributory negligence, but under

the view we take of the case it is not necessary to pass on that. In our judgment there is no evidence of negligence on the part of the defendant legally sufficient to entitle the plaintiff to recover. The only evidence of negligence suggested was that there was no headlight burning on the car. The plaintiff (appellee) said he had just quit work, and it was necessary to cross the tracks to go to the office; that he had to go over there before he went home. His evidence is thus given in the record: "So I had a clear view of that place for two squares before I got there to check and it was nothing in sight, and when I got at the track I started—I looked up and down, which I am always careful about that, and I have been there over thirty some years and was never hurt by an engine and cars. I looked up and down. It was *no light on no engine,* or no whistle or bells blowing. As I stepped over the track this struck me." He was asked how far from the Camden shed he was hit and replied: "I guess about twenty feet. It is no lights in the bottom part of that shed *and the engine had none either,* so it was impossible for me to see any light at all." This then appears in his testimony: "Q. What do you mean by the engine? (Witness): Sir? (Mr. Sullivan): You said the engine. You don't mean engine? A. No, sir; the motor. Q. The electric car? A. Yes, sir." He then said: "When I left the oil house I have about two squares to walk straight up the wagon drive, just clear view of the shed." He said he was still in the Baltimore and Ohio yards and continued: "So I walked up there. As I went across to go in the office then I looked up and down and was careful, there was nothing in sight anywhere, and there was no lights or nothing. The morning was a little murky and they struck me." Again, he said he walked up two squares and repeated, "Clear view of the shed all the way," and then he started to cross.

He said further in his examination in chief that he didn't see any engine around there, but engines were up and down that yard all the time, six or eight of them every night. In point of fact, he called as a witness Charles A. Bell, a

locomotive engineer who was working in the Baltimore and Ohio yards at Camden, who testified that he was on his engine about forty feet "from where Mr. Lapp was standing when he was hit." He said that his yard engine was standing still at the time of the accident, facing west, but that he was looking backwards out of the engine toward Camden Station; that his engine was on track No. 4, behind the inbound train which he had followed up to the station for the purpose of pulling out the cars. The Short Line car was on track No. 5; he saw Mr. Lapp and he then saw the car, seeing them both almost at the same time. Mr. Lapp was straddling the right hand rail and the car was bearing down on him; the plaintiff was about forty feet from the witness. The morning was not very clear, quite hazy, dark and foggy. He was asked: "You say about forty feet? A. I seen the car about forty feet before it hit Mr. Lapp—about the time it hit Mr. Lapp. Q. About forty feet from you? A. Between thirty and forty." The witness was to the left of the Short Line car, facing out from Camden Station; his engine was standing on the track about eighteen feet distant from track No. 5, on which the Short Line car was approaching."

The plaintiff must have been very much confused, as he swore he did not see any engine, and could see nothing, when his witness, the engineer, could not only see the car, but could see him thirty or forty feet away. The witness Edwards, who went into Camden Station on a Baltimore and Ohio train due there at 6.30 A. M. on track No. 4, said some one told him that Mr. Lapp was hurt. He went over to see him and found him lying on the ground, on the west side of the track used by the Short Line, just before he was picked up. He was asked: "Did you notice whether the Short Line car had a light on it or not?" and answered, "No, sir, it hadn't a light." Again he was asked: "Do you know what kind of lights they have? A. Yes, sir. Q. What kind? A. A big light about that big around and have two bars across the front and where the bars are they hang the lights on them. Q. Is it a portable light? A. It is a portable light.

Q. You are absolutely sure there was no light on that car this morning? A. No light whatever. I walked right around the front of the Short Line car. Q. You took especial notice of no light? A. No light there because I would have seen it. It would have lit the whole place up if there had been."

It is clear that he was speaking of a headlight on the car and he did not even know whether or not there was one on the car before the accident, although the motorman admitted that there was not. He did not get there until after the accident and on cross-examination was asked: "You don't know whether there was a headlight on it before the accident?" and replied, "I can't say. Q. All you know, there was no headlight after the accident? A. When I went out. Q. You don't know whether the motorman turned it off to keep from blinding people? A. No." He further said: "The car was lit up on the inside," and was asked: "Didn't that light shine through the window above where the motorman stands?" and replied: "It shines through all the windows when the car is lit up the same as side." Later he was asked: "If you had been across that track—No. 5 track—and looked in the direction from which the car, Short Line car was standing, couldn't you have seen it, with or without the headlight of which you speak? (Witness): Could I have seen it? (Mr. Barton): Yes?" and he answered "Yes." He was asked: "Lights inside shine out that glass front?" and answered: "Yes, sure." It is equally clear that the plaintiff did not mean to say that the car was not lighted, as it was shown to be, but he meant, and could only have truthfully said, that it did not have the headlight lit.

On the part of the defendant, it is shown by witness Amoss that he was a passenger on the Short Line, seated on the front seat; that "the car was running passenger end forward, with the motorman's box in the right hand corner, so that the seat ran around the rest of the front with glass behind it"; that there were lights lit in the car. At the time of the accident the witness was seated in front waiting for the conductor to take his ticket when he heard the whistle

blow; he looked and saw the head of a man starting across the side of the track; the man was not on the track, he had just started to cross when he was hit; the car stopped so that the baggage door was opposite where the man lay. He also said that there were two lights on the front of the car where they have the sign "Local Train"; the perforated sign had been removed and the lights were burning in the receptacle behind it. The place for the sign is just in front of the motorman. It was not very light at the point of the accident, but it was bright enough for the witness to see the plaintiff. This also appears in his testimony: "Q. Do you know whether or not there were any lights on the front of this car? A. There were two lights on the front of the car where they had this Local Train, or rather, Annapolis Short Line Train. They had run that out and that was burning. Q. That was in front of the car? A. Yes, sir. Q. Is that in the same place where the headlight is? A. Just to the side, in front of the motorman. Q. Where he puts the slide Annapolis Local, or Washington Local? A. Yes, sir. Q. Before he started he took that out and the light was burning? A. The slide was out. Q. You know these lights were burning? A. Yes, sir. Q. Did you see them? A. Yes, sir. Q. There was no headlight burning? A. No, sir; this light was burning. Q. Can you tell us whether the platform lights were burning? A. They were burning."

The motorman on the car said that the accident happened about thirty or forty feet from the south end of the Camden Station platform, and he thought the car was moving between six and eight miles an hour at the time, and the car was lighted up; that they had not been allowed to burn the arc light in the Camden yards for some time; the Baltimore and Ohio gave that order because for trains coming towards us it was hard to see the targets. He testified that "a headlight was on there but it wasn't lit, the arc light, and in front of me there is a sign about this long (indicating) 'Annapolis Short Line' and it has got 'Local' on it, too, picked in the iron and behind that there is two incandescent lights; when

we are not burning the arc light we pulled them out. Q. Did
you have the two lights burning that morning? A. Yes, sir.
Q. And the view of these two lights was clear? A. Yes, sir;
nothing in the way."

This account of the accident is given by the motorman:
The witness said that he saw the plaintiff walking along the
side of the fence where Barre Street terminates at the tracks;
he was walking toward the train in the space between the
tracks and the fence which is about four or five feet wide;
there is room to walk there and workmen are accustomed to
walk in that space. The wind was blowing and the plaintiff
had his lamp on his arm and his hands in his pocket; when he
got within about ten feet of the train he stopped and turned
as if to go across the tracks; the witness blew his whistle and
put on his emergency brakes, but the car struck the plaintiff
and knocked him to one side where he lay between the car
and the fence about opposite the baggage door after the car
had stopped. On cross-examination, the witness said that
there were two little lights in the box behind the place for
the illuminated sign and that the sign had been pulled out.
The car was not running very fast at the time of the accident.
He could not use the headlight in the Camden Station yards
and that when the cars came in at night it was the custom to
pull out the little slide and show the two incandescent lights,
after the cars crossed the Baltimore and Ohio tracks. When
the cars got outside the Baltimore and Ohio yards the larger
light was lit. They had orders from the Baltimore and Ohio
not to use the larger lights in the yard. The conductor testi-
fied that all the lights were burning; that at the time of the
accident he was walking towards the front of the car and
heard the motorman give his signal and knew from that there
was something on the track. He did not see the plaintiff be-
fore the accident.

It was shown that the track was straight from where the
car was after the accident up to where the cars on the Short
Line put off and take on passengers. There were lights in
Camden Station, and there can be no possible doubt under

the evidence that the car was lighted up, as the plaintiff was not asked whether the car was lighted and all the witnesses on both sides who spoke of that said that it was. There is nothing whatever in the record to show any negligence on the part of the agents of the appellant, unless it could be said that not having a headlight on the car was negligence. That surely cannot be, if they had, as the testimony conclusively shows, the car lighted up, moving on a straight track, and not going over any public crossings. As we have seen, the engineer called by the plaintiff saw both the car and the plaintiff thirty or forty feet away. If the passenger who testified, and the motorman were telling the truth, there was not only the light of the car, but the incandescent lights in front of the car burning at the time. If anyone having a clear view of the track as he walked between it and the fence up towards Camden Station failed to see the lighted car, it must have been because he was not paying attention to what he was doing when he started to cross the track, and not because the defendant was negligent. The car was scheduled to leave at 6.30 A. M. and it was, according to the time fixed by the witnesses, about on time, as they spoke of the accident being about that hour. Regardless of the question of contributory negligence, if anyone could, by the use of his eyes, see a lighted car coming on that track towards what is spoken of as Barre Street, which we understand to be just below the shed of the Camden Station, but does not cross the tracks, upon what principle can it be said that it was negligence not to use an arc headlight? We understand Barre Street is not an open street crossing the tracks of the Baltimore and Ohio Railroad Company, including the one that the Short Line used. The motorman said he saw the plaintiff walking along the side of the fence where Barre Street "terminates at the tracks," and there is nothing to show that it does cross, or is used as a street over the tracks. So far as appears in the record, no one would have occasion to cross track No. 5, the one used by the Short Line, unless it was some one in the employ of the B. & O. or the Short Line, who would know,

or ought to know, that in crossing these tracks or any of them they must keep their eyes open and be on the lookout. The court can take judicial notice of the fact that a lighted electric car—especially when passing over a dark track, which the plaintiff says there was at the end of the shed—can be seen before daylight. Mr. Amoss, the passenger, testified he saw the plaintiff starting across the track and, as we have seen, the Baltimore and Ohio engineer saw him and the car, thirty or forty feet away from his engine.

We have been referred to no case holding that it was negligence not to have a headlight on the electric car, lighted as this car unquestionably was, at such a place as where this accident happened, and without passing on the question of contributory negligence of the plaintiff, we are of opinion that the first prayer offered by the defendant should have been granted, because there was no evidence legally sufficient to entitle the plaintiff to recover. It becomes unnecessary, therefore, to discuss the other prayers.

As nothing could be accomplished by granting a new trial, the case must be reversed without doing so.

> *Judgment reversed without a new trial, the appellee to pay the costs.*